NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0668n.06

Nos. 12-6115, 12-6150

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff-Appellee, ) <br> ) <br> v. ) <br> ) <br> KEAIRUS WILSON, ) <br> ) <br> Defendant-Appellant, ) <br> ) <br> RONDARIUS WILLIAMSON, ) <br> ) <br> Defendant-Appellant. ) <br> ) <br> ) | **FILED** <br> Aug 27, 2014 <br> DEBORAH S. HUNT, Clerk <br><br> ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |

Before: NORRIS, CLAY, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. The cardinal rule of membership in the street gang known as the Bloods was to retaliate against anyone who "disrespected" them or was part of the opposition. Keairus Wilson and Rondarius Williamson were Bloods members who obeyed this rule to deadly effect. A jury later convicted each of numerous gang-related and firearms offenses, including murder. They now challenge some of those convictions on numerous grounds. We mostly affirm, but vacate in part.

I.

The Bloods are a street gang formed in Los Angeles during the 1970s. They have a longstanding rivalry with another gang called the Crips. The Eastside Skyline Pirus and the

Treetop Pirus are both affiliates of the Bloods with local outfits in Nashville, Tennessee. The two Piru gangs sometimes collaborated and operated in similar fashion.

To become a member of either gang, one first had to be "beat in"—which involved existing members beating up aspiring members. Each gang had a hierarchy: A new member started out as a Tiny Gangster, and could advance in rank to Baby Gangster, Young Gangster, Young Original Gangster, Original Gangster, and, in some exceptional cases, double or triple "OG." A member advanced by "putting in work"—that is, by "fighting, shooting, basically being into it with the opposition, opposition meaning [C]rips." Lower-ranked members had a "Big Homie"—a mentor of sorts—higher in rank.

Each gang held regular meetings and had extensive rules. For instance, if an Original Gangster says "go across the street and shoot this person, you need to do it." And if a Crip "disrespects" a member, then "handle your business"—meaning "assault them or possibly shoot them[,]" since "[i]t would be considered weak" not to. If a member violated the rules, he faced a "trial and jury" of the gang's other members. By a majority vote, those members could kick him out of the gang. Or they could merely punish him. For example, one member, known as Jo-Jo, disrespected his Big Homie; other members took Jo-Jo out to a field, formed a circle around him, and beat him. By the end, Jo-Jo "couldn't stand up" and "was coughing up blood."

\*     \*     \*

Keairus "Key-Thang" Wilson was a member of the Eastside Skyline Pirus, eventually attaining the rank of Young Original Gangster. In June 2008, Wilson was outside the James Cayce Housing Projects, talking with fellow gang members Jermaine Tate and Lonnie Newsome. A car pulled up and parked just ahead of the group. Newsome told Wilson that Michael Goins—a member of a rival gang called the Gangster Disciple Crips—was inside the car. Goins got out

of the car and walked up a set of concrete steps towards some apartments. Wilson followed behind Goins and shot him three times in the back. Wilson then stood over Goins, shot him twice more, and walked away. Someone yelled that Goins was still alive and reaching for his gun. Wilson dropped his gun and ran. A man named Reggie Ba—no apparent gang affiliation or motivation—then shot Goins, who "let go of his gun and just kind of lay down."

*    *    *

About a month later, Wilson was "just chilling, messing around" with fellow gang members Ricky Williams, Cedric Woods, Antonio Washington, and Montez Hall. All but Washington had guns. They decided to look for members of a rival gang called the Five Deuce Gangster Crips, who, they believed, had recently killed an Eastside Skyline Piru. Williams drove. First the group went to a gas station, where they saw a Five Deuce Gangster Crip known as Little Archie. The group's "intention was to shoot him[,]" but there were "too many people" around.

The group then began looking for members of the the 98 Mafia Main Street Crips, particularly one known as Killa Pooh. Williams pulled into a parking lot near an apartment complex. A red car pulled into the same lot. The group recognized the car's driver as Killa Pooh's girlfriend, Alexandra Franklin. She dropped off a passenger and began to drive away.

Williams followed. A half mile down the road, Franklin pulled up to a stop sign. Williams pulled up along the driver's side of Franklin's car. Wilson, Woods, and Hall then fired their guns out of the windows and at Franklin's car—"maybe like 20 shots," they "just kept firing[.]" Already hit by several bullets, Franklin got out the car and tried to run away. She stumbled and fell instead. Her car—still in drive—drifted into someone's yard. Williams then ran the stop sign and took a right turn. An SUV sped after them. Hall, who was in the front-

passenger seat, shot at the SUV out of the driver's-side window, nearly hitting Williams in the face.  Williams punched Hall, made for the highway, and lost the SUV.

Alexandra Franklin died four days later.

*    *    *

Rondarius "Killa" Williamson was a member of the Treetop Pirus.  In May 2009, he attended Maplewood High School's graduation ceremony at the Gentry Center, on the campus of Tennessee State University.  The Gentry Center is a basketball arena with two levels of bleachers and a capacity exceeding 10,500.  Williamson went to the ceremony with a few friends, including fellow gang member Terrence Jones.  They went to the upper level and were joined later by two more gang members, Adrian Montgomery and Anthony "Doo Daddy" Lampkins.  The group remained in the upper level, watching the ceremony and "chilling[.]"  As the ceremony ended, people made their way to the exits.  Persons in the upper level had to walk down stairs to reach the exits on the lower level.  One stairwell led to a foyer with two exits about ten yards apart—one on the west side, one on the east side.  The bottom of the stairwell was adjacent to the doors on the west side.  Someone walked down those stairs, pulled out a gun, and shot towards the doors on the west side.  The bullets hit a Gangster Disciple Crip named Andreus Taylor.  Taylor tried to run away from the Gentry Center, but stumbled down a nearby hill.  He died later that day.

*    *    *

A federal grand jury thereafter indicted dozens of Eastside Skyline Pirus and Treetop Pirus on dozens of violent-felony, drug, gun, and racketeering charges.  Nearly all of the defendants signed plea agreements.  But Wilson and Williamson went to trial, where a number of their fellow gang members testified against them.

The jury convicted Keairus Wilson of two counts of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1)—for the murders of Alexandra Franklin and Michael Goins—and one count of RICO conspiracy in violation of 18 U.S.C. § 1962(d). The jury also convicted Wilson of two counts under 18 U.S.C. § 924(c) for using or carrying a firearm, two counts under § 924(j) for causing someone's death while doing so, and one count under § 924(o) for conspiring to use or carry a firearm. The district court sentenced Wilson to separate terms of life imprisonment for the RICO-conspiracy, murder-in-aid-of-racketeering, and § 924(j) counts. The court sentenced Wilson to 20 years' imprisonment on the § 924(o) count, 25 years' on one of the § 924(c) counts, and 10 years' on the other.

The jury convicted Rondarius Williamson of one count of murder in aid of racketeering—for the murder of Andreus Taylor—and one count of RICO conspiracy. The jury also convicted Williamson of three counts under § 924(c), one under § 924(j), and one under § 924(o). The district court sentenced Williamson to separate terms of life imprisonment for the RICO-conspiracy, murder-in-aid-of-racketeering, and § 924(j) counts. It sentenced Williamson to 240 months' imprisonment on the § 924(o) count, 120 months' on one of the § 924(c) counts, and 300 months' on each of the other two.

This appeal followed.

## II.

### A.

Each defendant argues that insufficient evidence supported his conviction for murder in aid of racketeering. We must uphold the convictions if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

(1979) (emphasis in original). The elements of murder in aid of racketeering are: (i) the murder of a person; (ii) "for the purpose of gaining entrance to or maintaining or increasing position"; (iii) "in an enterprise engaged in racketeering activity[.]" 18 U.S.C. § 1959(a)(1).

1.

Although Wilson does not dispute that he killed Alexandra Franklin and Michael Goins, he disputes whether he did so "for the purpose of . . . maintaining or increasing" his position in the gang. *Id.* We recently declined to presume that gang members "are always motivated, at least in part, by their desire to maintain their status within the gang." *United States v. Hackett*, ___ F.3d ___, No. 12-4428, slip op. at 7 (6th Cir. Aug. 7, 2014) (brackets and internal quotation marks omitted). Instead, this element of the statute is met only "if the jury could find that an animating purpose of the defendant's action was to maintain or increase his position in the racketeering enterprise." *Id.* (internal quotation marks omitted).

As a general matter, it is undisputed that an Eastside Skyline Piru, like Wilson, could maintain or increase his position in the gang in multiple ways. One way was "putting in work[,]" which meant "fighting, shooting, basically being into it with the opposition[.]" Another way was following the gang's rules, one of which was that, if a Crip "disrespects, handle your business"—"assault them or possibly shoot them[.]" As for the murders here, Wilson and his fellow gang members had been looking for 98 Mafia Main Street Crips—Killa Pooh in particular—when they saw Alexandra Franklin. They had a discussion before they decided to follow her. Ricky Williams and Cedric Woods each testified that he did not want to go after Franklin; but Wilson convinced them to do it because Franklin's boyfriend was Killa Pooh, a Crip who had threatened to shoot Woods's girlfriend. From this testimony, a jury could find that Wilson shot Franklin

because she was affiliated with the "opposition" and because her boyfriend had threatened to shoot Woods's girlfriend—for if a Crip "disrespects, handle your business[.]"

The Goins murder followed a similar pattern. Goins too was part of the opposition—a Gangster Disciple Crip, who had "beef[ed]" and "had some words" with members of the Bloods at a club. Moreover, Jermaine Tate testified that, a few days before the shooting, he was driving around the projects with Lonnie Newsome and Wilson. They saw Goins. Wilson was going to shoot him then, but Newsome said "don't do it outside my car[.]" So they drove off. Wilson and Newsome then had a conversation about why Wilson wanted to shoot Goins: "a female said that Mike G was going to get Keairus . . . . Keairus wanted to get him before he got him." From this testimony, a jury could find that, when Wilson shot Goins a few days later—without provocation and from behind—he did so because Goins was a Crip who had threatened Wilson and disrespected the Bloods. A jury could therefore find that, when Wilson murdered Franklin and Goins, he did so at least in part to maintain or increase his position in the gang.

2.

Williamson likewise challenges his conviction for murder in aid of racketeering, which was based upon the murder of Andreus Taylor during a high-school graduation ceremony at the Gentry Center. But Williamson's argument is that he did not kill Taylor in the first place. At trial, the government's case against Williamson relied primarily on three witnesses. First, Adrian Montgomery testified that he was sitting with Williamson, Terrence Jones, and Anthony Lampkins in the bleachers during the graduation ceremony. Montgomery testified that Williamson said "he was going to get somebody[,]" and then asked Jones for a gun. Jones obliged. Montgomery then testified that at the end of the ceremony, all four went down the stairs to exit; and then Williamson "let[] shots at the door."

Second, Accacia Bonner testified that she watched the graduation ceremony with her boyfriend. She further testified that while she was watching the ceremony she noticed a man sitting in the bleachers—"he was attractive, so he caught my eye." As the ceremony ended, she walked down the stairs to exit. She saw two men standing by the door: "they opened the doors, and one pulled a gun and fired outside the doors." A few days after the shooting, the police showed Bonner a photo lineup. She was unable to make a positive identification, but was "80 percent" certain that Williamson was the shooter. In court, she testified that the shooter was the same man who had earlier caught her eye during the graduation ceremony. She identified Williamson as that man.

Third, Kaylon Cunningham testified that he was walking towards the Gentry Center when he saw numerous people come out. He made "eye contact" with a man who was "tucking something in"—"the back [] of a handgun." Cunningham identified Williamson as that man. The government also relied on a telephone call in which Williamson told his mother and another woman that, "if everybody just sticks to the same story, we'll get through this"; and a letter in which Williamson told Montgomery "[y]ou bullshit coming to the Feds. . . . keep your mouth shut and keep it real."

As a general matter, Williamson attacks the credibility of the government's witnesses, characterizing them as a convicted felon (Cunningham), a convicted liar (Montgomery), and a 16-year-old girl (Bonner). But "determining the credibility of witnesses is a task for the jury[.]" *United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004). We have no basis to set aside the jury's credibility determinations here.

Williamson next argues that several conflicts in the government's evidence would preclude a rational juror from finding that Williamson shot Taylor. The first conflict is that

-8-

Bonner said that the shooter was wearing a white shirt, whereas Montgomery and Cunningham testified that Williamson was wearing a black shirt. Williamson adds that, during the pretrial identification, Bonner was only 80 percent certain that Williamson was the shooter. A jury could have found, however, that Bonner recognized Williamson's face but mistakenly recalled what he was wearing. And a jury could have discounted Bonner's testimony or even rejected it because of her 80-percent identification, but still convicted Williamson on the basis of Montgomery's testimony, Cunningham's testimony, the jailhouse phone call, and Williamson's letter.

As for the second conflict, Williamson contends that the shooter ran out the east exit of the Gentry Center, while surveillance video outside that exit, Williamson says, proves that he did not run that way. But both premises are shaky. Although some witnesses told Officer Donald Black that the shooter ran out the east exit—which was only ten yards from the west exit—other witnesses said that the shooter "ran out the doors" without specifying which exit he used. And Bonner testified that the shooter ran back inside, towards the gym floor. In all, the evidence shows confusion about which way the shooter ran amid the tumult that followed the shooting. For that reason, a jury need not have found that the shooter ran out the east exit.

Nor would a rational jury need to find that the surveillance video is as conclusive as Williamson thinks it is. Williamson says the video shows he did not run out the east exit. Immediately after the shooting, however, the camera zoomed in and out and moved in multiple directions so that the doors were not always fully in frame and individuals were not always easy to identify. And Mironda Morgan testified that the video was "real blurry[.]"

The third conflict is that Montgomery initially said he met up with Williamson (and other gang members) on a nearby outdoor basketball court 15 minutes after the shooting, but then identified himself and Williamson on the surveillance video standing outside the east exit at that

time. Even so, a jury could have accepted Montgomery's clarification that he first met Williamson outside the east exit before walking 100 yards to the basketball court. Or a jury could have rejected Montgomery's testimony and credited Morgan, who could not identify Williamson on the same video and said that she saw him on the basketball court 15 minutes after the shooting.

There were undoubtedly conflicts within the government's case, which is only to be expected when witnesses testify about a scene as chaotic as the Gentry Center shooting. But those conflicts were for the jury to resolve. *United States v. Boring*, 557 F.3d 707, 711 (6th Cir. 2009). And here the jury was entitled to resolve them in the government's favor. The jury rationally found that Williamson shot Taylor.

B.

Williamson raises three more arguments related to the Taylor murder. First, he challenges the district court's denial of his request that the jury view the Gentry Center in person. We review that denial for an abuse of discretion. *See United States v. White*, 563 F.3d 184, 191 (6th Cir. 2009); *United States v. Moonda*, 347 F. App'x 192, 201 (6th Cir. 2009). Here, the jury saw photos, diagrams, and surveillance video of the Gentry Center. Williamson does not explain why these exhibits were insufficient in any respect, other than to speculate that the verdict might have been different had the jury seen the Gentry Center in person. The district court did not abuse its discretion.

Second, Williamson argues that the district court's refusal to suppress Bonner's in-court identification violated due process because that identification, Williamson says, was based upon a suggestive pretrial identification. To prevail, Williamson must first show that the pretrial

identification was "impermissibly suggestive[.]" *United States v. Meyer*, 359 F.3d 820, 824-25 (6th Cir. 2004). Then he must show that the in-court identification was itself unreliable. *Id.*

The risk that a pretrial identification is impermissibly suggestive is "heightened" if, among other things, "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Simmons v. United States*, 390 U.S. 377, 383 (1968). In that event, the witness "can feel pressure to make an identification . . . for fear of jeopardizing the case against the arrested suspect." *United States v. Saunders*, 501 F.3d 384, 391 (4th Cir. 2007). Here, Detective James Bledsoe, who conducted the identification, told Bonner that there was "a person of interest in [the] group of pictures[.]" Bledsoe emphasized, however, that the person of interest might not be the "individual responsible for the crime"; and Bledsoe did not otherwise suggest that the police had evidence that someone in the photo lineup shot Taylor. Thus, there was no risk that Bonner would feel pressure to identify someone, and the pretrial identification was not unduly suggestive. *Id.*

Third, Williamson challenges the district court's denial of his motion to dismiss and his motion for a new trial. Both motions rested upon a claim of prosecutorial misconduct: that the government threatened Terrence Jones and consequently deterred him from testifying in Williamson's favor at trial. We review the denial of both motions for an abuse of discretion. *United States v. Hanna*, 661 F.3d 271, 297 (6th Cir. 2011); *United States v. Overmyer*, 899 F.2d 457, 465 (6th Cir. 1990). A district court abuses its discretion when it relies on clearly erroneous factual findings. *Hanna*, 661 F.3d at 297.

In 2012, Special Agent Mickey French and prosecutor Cody Skipper interviewed Jones about the Taylor shooting. At a post-verdict evidentiary hearing, Jones testified that, during the interview, Skipper threatened to charge him with being an accessory to the murder unless "he

signed a paper saying Rondarius Williamson killed Andreus Taylor" and testified to that effect at trial. Jones further testified during the hearing that he did not believe Williamson killed Taylor, did not want to lie at trial, and thus went into hiding in order to avoid having to do so. But Jones's testimony during the evidentiary hearing was inconsistent. He also said that he did not testify at trial because Williamson told him "don't even worry about it, you ain't got to come, everything is looking good[.]" Moreover, Jones testified that, if either the government or defense had called him to testify, he would have shown up. In addition, French testified that Skipper never threatened Jones. Thus, we have no basis to say the district court clearly erred when it found the entire factual basis of Williamson's prosecutorial-misconduct claim—that Jones was too "scared" to testify because the government had threatened him with prosecution—was not credible.

C.

Both defendants argue that the district court should have given two additional instructions to the jury.

1.

The first instruction concerns each defendant's conviction under 18 U.S.C. § 924(o) for conspiracy to violate § 924(c). Section 924(c) criminalizes using or carrying a firearm during and in relation to a predicate crime of violence. Thus, to be guilty of a § 924(o) conspiracy, a defendant must agree that someone will use or carry a firearm during and in relation to a predicate crime of violence. Here, the district court listed four crimes of violence that could support the § 924(o) charges: robbery, carjacking, murder in aid of racketeering, and assault with a dangerous weapon in aid of racketeering. The court also told the jury its verdict on all counts "must be unanimous." The defendants contend that the jury had to be unanimous as to

which predicate crime of violence each defendant conspired to commit, and that the district court should have given the jury an additional instruction to that effect. Neither defendant offered this instruction at trial, so we review its omission for plain error. *United States v. Woodruff*, 735 F.3d 445, 448 (6th Cir. 2013).

Although a jury must unanimously agree that the government proved each element of a crime beyond a reasonable doubt, it need not agree on the facts or means underlying each element. *Richardson v. United States*, 526 U.S. 813, 817-18 (1999). Here, there are two possible interpretations of § 924(o): On the one hand, as the defendants argue, § 924(o) could require a defendant to conspire to commit a specific crime of violence—say, robbery—in which case, the jury must unanimously agree that the defendant conspired to commit robbery. On the other hand, § 924(o) could require a defendant to conspire to commit a crime of violence generally, in which case, the jury need not unanimously agree on the particular crime of violence that the defendant conspired to commit, so long as they each agree that he conspired to commit some crime of violence. Under that view of § 924(o), the district court's omission was proper. We have not addressed this question; and, as the defendants concede, there is precedent to support both sides. *See*, *e.g. id.*; *United States v. Hart*, 635 F.3d 850, 856 (6th Cir. 2011). For that reason, there was no plain error.

2.

The defendants also argue that the district court should have given a specific unanimity instruction on the RICO conspiracy charge. Both defendants objected to the omission of this instruction at trial, so we review the court's refusal to give it for an abuse of discretion. *United States v. Reichert*, 747 F.3d 445, 451 (6th Cir. 2014).

Nos. 12-6115; 12-6150
*United States v. Wilson & Williamson*

To be guilty of a substantive RICO violation, a defendant must participate in the conduct of an enterprise by committing two predicate acts of racketeering. *See* 18 U.S.C. § 1962(c). To be guilty of RICO conspiracy, however, the defendant need not commit a predicate act, or even prove that anyone took any steps toward committing a predicate act. *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008). Thus, to convict a defendant of RICO conspiracy, the jury need not be unanimous as to the specific predicate acts that the defendant agreed someone would commit. *United States v. Randall*, 661 F.3d 1291, 1299 (10th Cir. 2011); *United States v. Applins*, 637 F.3d 59, 81-82 (2d Cir. 2011). Indeed, the conspirators themselves might not have planned them out yet. Instead, the jury need only be unanimous "as to the *types* of predicate racketeering acts" that someone would commit. *Randall*, 661 F.3d at 1299 (emphasis added).

Here, the district court gave the jury a general unanimity instruction and said that each defendant must have "agreed that someone, not necessarily themselves, would commit at least two" of "19 possible racketeering acts" listed in 18 U.S.C. § 1961(1). The defendants assert that the district court should have told the jury that it had to be unanimous as to specific predicate acts that each defendant agreed someone would commit. But to be guilty of RICO conspiracy, as shown above, a defendant need not agree that someone would commit two specific predicate acts. The district court did not abuse its discretion in refusing to give the defendants' instruction.

Relatedly, Williamson challenges the sufficiency of the evidence supporting his conviction for conspiracy to violate RICO. In particular, he says there was insufficient evidence that he agreed to participate in the conspiracy. But "a defendant's agreement to participate in [a] RICO conspiracy may be inferred from his acts." *United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006). And Williamson himself committed two of the conspiracy's predicate racketeering acts: first, the murder of Andreus Taylor (the conviction for which we uphold

today); and second, the shooting of another Gangster Disciple Crip named Rontereese Armstrong (the conviction for which Williamson does not appeal). On this basis, a jury could infer that Williamson "agreed that either he or someone else would commit at least two RICO predicate acts." *United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008).

D.

Finally, Wilson makes a Double Jeopardy Clause argument. The Double Jeopardy Clause bars multiple punishments for the "same offense" unless Congress has authorized multiple punishments for that offense. *Whalen v. United States*, 445 U.S. 684, 688-89 (1980). Two offenses are "different" if each requires proof of a different element. *Brown v. Ohio*, 432 U.S. 161, 167-68 (1977). Here, the jury convicted Wilson of two counts under 18 U.S.C. § 924(c) and two counts under § 924(j)—one each for the Franklin murder and one each for the Goins murder. Section 924(c) requires proof that the defendant knowingly used or carried a firearm during and in relation to a crime of violence. Section 924(j) requires proof of the same, plus that the defendant caused someone's death "in the course of" the § 924(c) violation. Every element of § 924(c) is also an element of § 924(j). Thus, § 924(c) is a lesser-included offense of § 924(j)—which means that, for purposes of the Double Jeopardy Clause, § 924(c) counts as the "same offense" as § 924(j). Moreover, there is no indication that Congress authorized multiple punishments for these offenses. The government concedes the Double Jeopardy violation; and thus both parties agree that we should vacate the § 924(c) convictions.

\*   \*   \*

The district court's judgment in Williamson's case is affirmed. The district court's judgment in Wilson's case is also affirmed, except that we vacate his § 924(c) convictions.